**Thomas S. SCANLAND**

v.

**U. S. ARMY TEST AND EVALUATION COMMAND, DEPARTMENT OF the ARMY, et al.**

**Civ. A. No. 73–258–M.**

United States District Court,
D. Maryland.

Jan. 13, 1975.

A. Freeborn Brown, Bel Air, Md., and Joseph B. Meranze and Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for plaintiff.

George Beall, U. S. Atty., and Parker B. Smith, Asst. U. S. Atty., Baltimore, Md., for defendants.

JAMES R. MILLER, Jr., District Judge.

## OPINION

Plaintiff, Thomas S. Scanland, was improperly removed from his civilian employment with the United States Army Materiel Command. He is entitled to be reinstated, but may be subject to less drastic disciplinary action than was imposed upon him. The reasons for this court's conclusions are set forth herein.

This suit was filed by plaintiff, seeking reversal of the decision of the United States Civil Service Commission Board of Appeals and Review (BAR) which upheld his discharge as a government employee, effective September 2, 1970. Review of his dismissal has been sought in this court pursuant to provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Jurisdiction in this court is based upon 28 U.S.C. §§ 1331 and 1361. See Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

### Background

Plaintiff, a career government employee and an engineer by profession, had an unblemished record of 25 years of service prior to the events which precipitated his discharge. At the height of this country's intervention in South Vietnam, plaintiff as a civilian employee with the United States Army Materiel Command, was assigned the responsibility of representing the Test and Evaluation Command (TECOM) Aviation Test Activities Division of the Department of the Army on a special high priority project designed to provide night operations capability for the U. S. Army in Vietnam. (R. 74–75).

The project had a so-called "brickbat priority," defined as the highest national priority, and was directly approved by the President of the United States. It was designed to accomplish in two years that which normally took eight years to achieve. (R. 76–77). TECOM's mission normally was independently to test new weapons systems to determine their suitability for deployment to Vietnam. Because of the urgency of the "Night Vision" project, however, a number of shortcuts were instituted. It was the responsibility of Mr. Scanland to determine what shortcuts were justified and proper under the circumstances while at the same time assuring TECOM's commander that the hardware items developed by the project were suitable for deployment. Mr. Scanland had direct responsibility for seven of the products of the project which were directly related to airborne operations. (R. 81–83). His duties required him often to travel in connection with the project. (R. 45, 83, 107, 413–14, 489, 590–93).

Plaintiff resided in Aberdeen, Maryland, near the Aberdeen Proving Grounds, the test facilities for TECOM. The project manager, Col. Lehner, had his office in Alexandria, Virginia, in the Kel-Tek Building. The Night Vision Laboratory Technical Center was located at Fort Belvoir, Virginia, and the Army Materiel Command Headquarters were located at Gravelly Point, Virginia. (R. 76–77). Because of the nature and complexity of his job, it was often necessary for Mr. Scanland to visit these places more than one time in a given day. (R. 45). In addition, he often went to meetings in the Pentagon, located in suburban Virginia. Within the scope of his

work, plaintiff would obtain prior authorization to travel from his superior, Col. Johnson. He would then pay his own travel expenses and subsequently submit travel vouchers to obtain reimbursement for his expenses.

On April 9, 1970, Col. Johnson issued a Notice of Proposed Removal to the plaintiff. (R. 677–79). The reason given for removal was plaintiff's submission of allegedly false travel voucher claims which resulted in his receipt of overpayments in excess of $2,000. Plaintiff was advised by Col. Johnson in the aforesaid notice:

"In view of your falsification of the foregoing travel records, I can no longer rely on you or assign any special projects or priority assignments to you in this directorate. I have therefore concluded that your retention will not be in the best interest of the government." (R. 678).[1]

The aforesaid notice further stated in pertinent part:

"2. Specific information in support of this charge is as follows:

"a. A listing of the forty-five (45) travel vouchers submitted by you for travel performed on or about 3 July 1968 and continuing through on or about 10 June 1969, with a copy of individual vouchers, is attached . . . . In these vouchers:

"(1) You listed speedometer readings you certified were actual readings at the commencement and conclusion of official travel when in fact the speedometer readings were not actual recorded readings.

"(2) You overstated actual mileage through the use of the aforementioned false readings.

"(3) You made claims for reimbursement for parking fees in excess of actual charges.

"(4) You made claims for reimbursement for telephone toll charges in excess of known rates.

"b. Through investigation of official records and discussions with officials at Fort Belvoir, Virginia, and the Night Vision Laboratory at Alexandria, Virginia, on 10 March 1970 it was determined that:

"(1) You submitted false claims for travel expenses purportedly incurred to, from, and in and around Fort Belvoir . . ., when in fact records and information obtained from officials at Fort Belvoir established that you did not visit the Night Vision Laboratory, the organization and location which would have been appropriate to your mission.

"(2) You submitted false claims for travel expenses purportedly incurred to, from, and in and around Alexandria, Virginia, when, in fact, you did not make all the trips claimed by you. . . . A comparison of the trips claimed by you on your travel vouchers to Alexandria . . . with the official visitor's log of the Night Vision Laboratory . . . establishes that you did not visit the Night Vision Laboratory, Alexandria, Virginia, on twenty-three (23) of the dates for which you submitted claims.

"c. . . . [A] detailed analysis was made of each voucher for the periods stated in 2a. . . . The analysis identifies overpayment of claims, some of which are based on a comparison of:

"(1) Speedometer readings stated on vouchers, and certified correct by you, versus the official mileage.

"(2) Telephone charges claimed versus actual telephone rates and telephone charges made from TDY

---

1. Plaintiff is a preference eligible veteran and, therefore, covered by 5 U.S.C. § 7512 which provides in pertinent part:

"(a) An agency may take adverse action against a preference eligible employee

. . . only for such cause as will promote the efficiency of the service."

stations where records show no visit was made or there is no record of a visit on the day of the call.

"(3) Parking fees claimed versus actual parking rates.

"d. The analysis further specified as false all claims for mileage in and around TDY stations."

Plaintiff pursued his available remedies within the Army Materiel Command, which included a hearing conducted by a grievance examiner for the Department of the Army. After conducting an extensive hearing during which Col. Johnson, Mr. Scanland, and the Director of Security for the Night Vision Laboratory testified (R. 392–675), the examiner issued findings and a recommendation that the plaintiff be reinstated and that he be given a reprimand and a 10-day suspension. (R. 351–362). General Izenour, the Commanding General of the Command, refused to reinstate the plaintiff, and Brig. General Whelan denied the last remaining intra-agency appeal. (R. 347–48). A hearing was held before a Civil Service Commission examiner after an appeal was filed with that Commission. Col. Lehner testified as did the plaintiff. (R. 69–133). The Philadelphia Regional Office of the Civil Service Commission rendered a decision on May 23, 1972, affirming plaintiff's discharge. (R. 53–60). An appeal was filed with the Board of Appeals and Review (BAR) which affirmed the discharge of the plaintiff on February 16, 1973. (R. 10–17). This proceeding followed.

The parties have filed cross motions for summary judgment under Rule 56, F.R.Civ.P.

Although the plaintiff originally raised a procedural due process issue concerning the validity of his discharge prior to an evidentiary hearing, that issue has been abandoned as a result of the decision in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), approving post-termination hearings for discharged government employees.

*Scope of Review*

The Administrative Procedure Act in its § 10(e)(2), 5 U.S.C. § 706, provides that:

"The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] . . .

"(E) unsupported by substantial evidence . . .."

These two provisions of § 10(e)(2) are part of six which are "separate standards." Citizens To Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

 Under the "substantial evidence" standard, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in [The Administrative Procedure Act] that courts consider the whole record." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474 at 488, 71 S.Ct. 456 at 464, 95 L.Ed. 456 (1951). Halsey v. Nitze, 390 F.2d 142 (4th Cir.), cert. denied, 392 U.S. 939, 88 S.Ct. 2316, 20 L.Ed.2d 1399 (1968). Substantial evidence has been defined as "more than a scintilla, but less than preponderance." Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).

 Even if an agency's finding may be supported by substantial evidence, its action based upon that finding may nonetheless be arbitrary and capricious. Bowman Transportation Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

"Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ulti-

mate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' The agency must articulate a 'rational connection between the facts found and the choice made.' While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (Citations omitted). (95 S.Ct. at 442).

Thus if the findings of the agency in a case of this type are supported by substantial evidence, the action of the agency in dismissing the employee may not be rescinded by the court provided that the agency has articulated a "rational connection between the facts found and the choice made," Burlington Truck Lines v. United States, 371 U.S. 156 at 168, 83 S.Ct. 239 at 246, 9 L.Ed.2d 207 (1962), even though the court might have itself preferred more moderate action on the part of the agency. Cf. Embrey v. Hampton, 470 F.2d 146 (4th Cir. 1972); Halsey v. Nitze, *supra.*

### Discussion

The essence of the charge against the plaintiff was that he *intentionally misrepresented* information on his travel expense vouchers *for the purpose of defrauding* the government by obtaining reimbursement for expenses which he did not actually incur. Both the grievance examiner (R. 361) and the Philadelphia Regional Office of the Civil Service Commission (R. 57) concur with the foregoing interpretation by this court of the charges. The record must be carefully scrutinized, therefore, to determine whether it contains substantial evidence to support the conclusion, not that there may have been errors in the vouchers submitted by Mr. Scanland, but that he intentionally misrepresented the facts set forth in his vouchers for the purpose of defrauding the government.

The cornerstone of the allegation of fraudulent misrepresentation by Mr. Scanland was management's position that plaintiff had charged expenses on his vouchers for trips to Fort Belvoir and to Alexandria, Virginia when, in fact, he had not been there. Added to this *prima facie* evidence of fraudulent activity by the plaintiff was an overstatement of mileage based upon incorrect odometer readings between the plaintiff's home and points to and from which he traveled, together with what appeared to be excessive telephone and parking charges.

Joseph F. Walsh, the security officer of the Night Vision Laboratory, testified that visitors to the Laboratory facilities at Fort Belvoir, Virginia as well as at the Kel-Tek Building in Alexandria were required to sign a log. According to Mr. Walsh, the record showed that the plaintiff had been at the Fort Belvoir facility only once during the period in question. (R. 426). He did not produce copies of the logs for the period in question, however (R. 433–34), and the sign-in, sign-out sheets at the main enclosure gate at Fort Belvoir had been destroyed. (R. 434). Mr. Walsh testified that on occasion persons at conferences at the two facilities at Fort Belvoir and at Alexandria, Virginia were not required to sign in and that often employees or persons familiar to the guards passed the security desk unnoticed. (R. 434, 444).

In reference to plaintiff's alleged misrepresentation of his visits to the Kel-Tek Building in Alexandria, Virginia, the documentary evidence, purporting to be copies of the logs of the Kel-Tek Building, was conflicting. There were no logs for certain dates when plaintiff was alleged not to have been at the Kel-Tek Building although his vouchers said that he was, and in other instances the logs for a certain date showed that Scanland was at the Kel-Tek Building at the time that his vouchers indicated that he was there. (R. 574–77). Plaintiff, through notations on his personal calendars and by use of certain unclassified documents which he had been able to obtain from the records of the project, was able to pinpoint his attendance at the

Fort Belvoir Lab and at the Kel-Tek Building on most of the dates in question. (R. 294–306; 317–331; 473–652; 117–123).

Out of 23 occasions on which plaintiff was alleged to have falsely certified that he had traveled to the Kel-Tek Building, there were 12 days where no supporting documents were filed by management to support its claim that plaintiff had failed to sign in on those days. On two days, October 25, 1968 and June 4, 1969, the sign-in records for Kel-Tek showed that the plaintiff was present on those occasions.

Col. Lehner testified before the Civil Service Commission examiner from his records and recollection that he recalled that plaintiff was at the Kel-Tek Building on at least eight of the disputed dates. Those dates were October 29, 1968 (R. 89), October 31, 1968 (R. 90–91), November 9, 1968 (R. 92), November 15 and 16, 1968 (R. 92–94), November 18, 1968 (R. 94), March 8, 1969 (R. 97), and June 4, 1969 (R. 101–2). In addition, Col. Lehner testified to 11 of the disputed dates on which he said that the plaintiff probably was at the Kel-Tek Building for meetings, those dates being October 5, 1968 (R. 87), October 11 and 12, 1968 (R. 88), October 25 and 26, 1968 (R. 89), November 1 and 2, 1968 (R. 91), February 9, 1969 (R. 95), March 22, 1969 (R. 99–100), May 3, 1969 (R. 100), and May 14, 1969 (R. 101). Of the remaining four dates in dispute, plaintiff's calendar lends support to his position that he was present at the Kel-Tek Building as indicated by his vouchers for those respective days, being February 1, 1969 (R. 120–21), February 19 and 20, 1969 (R. 121), and May 10, 1969 (R. 123). There were only two dates, February 19 and 20, 1969, on which the management records showed that plaintiff did not sign in the Kel-Tek Building but for which the plaintiff had no independent evidence, other than his own testimony and personal calendar, that he did in fact go to the Building on those days.

Col. Lehner also testified that on occasion persons who were members of groups did not sign in at the security desk at the Kel-Tek Building (R. 98). In addition, certain of the offices that would have been visited by the plaintiff were located in a trailer behind the Kel-Tek Building for which there was no separate security sign-in desk. (R. 109). Furthermore, on frequent occasions, Col. Lehner would meet plaintiff outside of the Kel-Tek Building and they would all proceed in a single car to the Pentagon for meetings. (R. 105).

In sum, the evidence, when viewed as a whole, fell far short of proving that the plaintiff was not present at the various points where he indicated he was present on his vouchers. Instead, the evidence as a whole tended to establish a lackadaisically enforced security system in which there were many possible explanations for the failure of such logs as were produced by management at the hearings to verify plaintiff's travel expense vouchers.

Management disallowed each claim of plaintiff for TDY station mileage as excessive. No evidence was presented, however, on this point by management other than the official table of distances of the Armed Services. (R. 210–231). It was anticipated by his superiors that plaintiff would be required to make various trips between Gravelly Point, Fort Belvoir, Alexandria, and other areas in the accomplishment of his mission and his travel orders always included prior authorization for "TDY mileage." (R. 411–15, 489). The "in and around mileage" was always explained to his superior, Col. Johnson, by Mr. Scanland. (R. 413–14, 489). Mr. Scanland testified as to what was involved in these "in and around mileage" trips as follows:

" . . . [E]very time I went to Washington there was some discussion; some difference of opinion between the project managers involved and it was necessary to go back and forth betwen those places almost every time I went down there. So I knew

that I was moving back and forth between Gravelly Point and Alexandria and Alexandria and Fort Belvoir and Gravelly Point practically every time I made that trip." (R. 592–593).

The "in and around mileage" was usually traveled on a circuitous but quicker route, for such trips as those between Gravelly Point and the Kel-Tek Building in Alexandria. Scanland testified:

"Yes, sir, there is a more direct route, proceeding up Interstate 95 directly toward the center of Washington. But in 1968 and '69, I tried that route once or twice and found myself hopelessly involved in traffic. In addition, that route was under construction for some months during that period." (R. 531).

Plaintiff would normally go around the Washington Beltway, Route 495, and then down the George Washington Parkway to Gravelly Point. (R. 529–30).

While it is true that certain of the vouchers of plaintiff indicated that he was at one location at an hour in a day in which a sign-in or security registration record of another facility indicated that he was at a different location, plaintiff explained these inconsistencies by stating that in the crush of his responsibilities he did not keep detailed records of mileage in TDY station trips, and he filed his vouchers late using estimates that he prepared from his calendar, his memory, and personal notes. (R. 524, 532, 546–47, 590–93, 610–12, 634, 642–43).

Col. Lehner, the project manager, testified before the Civil Service Commission examiner, referring to plaintiff, as follows:

"He assumed that responsibility for Aviation items. I personally felt that he was overloaded and he was responsive to a great many demands from my office to do a lot of traveling and, in fact, he must have made literally hundreds of trips, over a hundred trips, as I would recall, in exercising his responsibilities." (R. 83).

"Scanland was a constant fixture around the office. I would say that my secretary used to complain about his being there so much. We actually had a desk out in the outer office where Mr. Scanland could hang his hat when he would come to town." (R. 107).

Col. Johnson felt plaintiff to be a "very hard-working, diligent, conscientious employee" who was an "educated, intelligent, hard-working individual" whose sincerity he did not doubt. (R. 409–10). Col. Lehner testified as follows:

"Well, whenever the technical team for one of these projects had a meeting somewhere or an activity of some kind, Mr. Scanland was called upon by the technical team chief, who was literally the project engineer on that particular project. He was responsive to that project engineer and went to meetings called by the project engineer. He was also responsive to meetings called by my office and, like I say, these meetings were legion. There were literally hundreds of meetings.

"Q Now, would they entail meetings in your office at the Kel-Tek Building?

"A That's correct, sir. My office contracted facilities at various Department of Defense agencies throughout the United States.

"Q Did they include meetings at Fort Belvoir?

"A Correct, sir.

"Q Would they include meetings at the Pentagon?

"A The Pentagon? Yes, sir, that's right. And at Headquarters AMC, T–7, etc. . . . In my opinion, Mr. Scanland—Mr. Scanland's performance was outstanding which is tops in my estimation. He had a reputation with all the participants and team members of being an extremely competent engineer and being extremely competent in the

test and evaluation business and they frequently sought out his advice in not only the TECOM tests that were written but also in the numerous tests that had to be written for contract acceptance, for agency or command tests, and, last but not least, of course, the test and evaluation command test plan. These were all documented in a tremendous document which was known as the SEANITEOPS Coordinated Test Plan which when stacked up would probably be about three feet high, just a tremendous amount of documentation required." (R. 83–84).

One of the senior engineers of the project wrote that he knew ". . . of no one person who has made a more significant contribution toward furtherance of the Army Helicopter Armament Program than Mr. Scanland." (R. 110). In addition, Col. Johnson, in his evaluation reports on the performance of Mr. Scanland, gave him a "satisfactory" evaluation for the period from March 13, 1967, through March 9, 1969. (R. 489).

While the "official mileage" between the TDY points in suburban Virginia were less than the mileages contained in Mr. Scanland's vouchers, no evidence was presented to indicate that Mr. Scanland, as a civilian employee, was required to travel the shortest "official route" nor that he was ever instructed that he could be reimbursed only for the "official mileage" irrespective of the actual mileage which he traveled. (R. 532). Furthermore, Daniel J. Brown, a private investigator, whose automobile speedometer was calibrated by the Maryland State Police, testified that he measured the distances between various points frequently traveled by plaintiff and submitted his findings for the record. (R. 939–43). Those calibrated mileages were compared with the mileages set forth on the travel voucher and were understated on the vouchers with four exceptions. (R. 1093). In short,

management did not prove that the "in and around TDY mileage" claims were made with intention to defraud the government.

The next charge against plaintiff was founded upon his alleged intentional overstatement of the actual mileage traveled to and from his home at Aberdeen, Maryland when he was traveling to the Washington-Virginia area. Plaintiff admitted that his speedometer mileage readings may have been inaccurate and testified as follows:

"Well by the time—I believe the time this period occurred, July of '68, I had been involved in the SEANITEOPS Program for some year or year and a half and before that I was working with the other two project managers . . . in the places I was visiting I had been there a number of times and I had turned in previous travel vouchers and I had a pretty good idea of what the distances were between say Gravelly Point and three or four places in the Washington area; how far it was from Gravelly Point to Alexandria; how far it was from Gravelly Point to the Pentagon, to Fort Belvoir, and how far it was from Aberdeen to Gravelly Point and to Alexandria, no matter which route I took, either the Tunnel or by the Beltway, George Washington Parkway or the other routes that I traveled. I knew about what the mileage was and I usually tried when I left home to jot down what the speedometer reading was. . . . So I was pretty sure that whatever mileage was put on there was put on for the purpose of that trip for that day. So knowing these distances, I tried to put together a portion of what the driving was to each of the places that I visited and the places that I went. I didn't write down every time I got from Aberdeen to the first stop, write down the speedometer readings, and then before I left write it down again. I was pretty well concentrating on what I had to do. At any one time I probably had four to five things at once to

do and I knew I wasn't going to get but two or three of them done, and the least important to me of the things to get done was to put down some kind of a record of what I was doing; where I was going, how far I was driving, and what detailed expenses I was required to keep. I just didn't intentionally do it wrong, but I didn't figure that that was the important thing to make a record of. . . . The thing that I was concerned about was getting accurately how far I had traveled, the number of miles I had driven, not what the speedometer reading showed or didn't show at the time I stopped or when I started." (R. 590–93).

Plaintiff testified that his most common route from Aberdeen to Alexandria, Virginia was to take the Baltimore Beltway to the Baltimore-Washington Expressway, avoiding the Harbor Tunnel with its heavy traffic, and thence on the Baltimore-Washington Expressway to the Washington Beltway to its intersection with Route 95 below Alexandria and then to proceed about a mile to the Kel-Tek Building. (R. 529, 595–96). This distance was measured by the investigator as 112.9 miles (R. 491). A more direct route to the Kel-Tek Building in Alexandria was to use the Baltimore Harbor Tunnel and to proceed on I–95 directly through Washington, a distance measured by the investigator as 98.5 miles and a route which would require a 60-cent toll for use of the Harbor Tunnel facility.

Plaintiff admitted making a procedural error in that he generally put in his voucher the shorter distance plus the Harbor Tunnel toll rather than putting in a voucher for the actual longer mileage that he generally traveled. The result of this error was that Mr. Scanland always asked for reimbursement for what he thought was the shorter route, rather than the actual route which would have been 112.9 miles. Given credit at 10¢ per mile for the Harbor Tunnel toll, the equivalent of six miles,

the Harbor Tunnel route would translate into a compensable mileage of 104.5 miles, less than the actual route ordinarily traveled by plaintiff.

Unfortunately, plaintiff was in error in his original estimate of the mileage through the Harbor Tunnel route, according to his testimony, which resulted in an actual overstatement of the claim by about 40 cents for each trip between Aberdeen and Alexandria, Virginia.

Management also charged that plaintiff falsified his expense voucher by claiming reimbursement for telephone calls made by him at locations where he falsely stated he had traveled and by overstating the charges for calls which he might actually have made. The first prong of Management's claim disappears if management's disallowance of the Fort Belvoir and 23 Kel-Tek trips is overturned. As for the second prong, the most damaging part of the management's case to plaintiff was that he had charged telephone calls between Alexandria, Virginia and Fort Belvoir at overstated rates. According to management's evidence, such calls were local calls at 10¢ per call. On Voucher No. 657670, for instance, plaintiff claims $6.50 for two calls between Alexandria and Fort Belvoir. Plaintiff's explanation was that he grouped telephone calls, as he had been instructed that he could do, and that one call may have been between Alexandria and Fort Belvoir whereas the other call may have been to some other location. (R. 622). He testified that he did not keep detailed records of the telephone calls that he was making (R. 620) and that he estimated the amount of money that he spent on the calls in some cases. (R. 622). He had requested that he be given a telephone credit card (R. 643) in order that he might be able to keep a record of the calls and better account for them.

While the management's toll record which it introduced in evidence was for station-to-station rates only and did not include the federal tax, plaintiff testified that all the calls that he made were

person to person. (R. 534–35). Management did not show that the calls claimed by plaintiff were not in fact made.

Management's last charge against plaintiff was that he deliberately overstated his parking expenses in order to defraud the government of money. The plaintiff testified that he used valet parking. (R. 616). Management did not establish that this was untrue nor did it attempt to show that it had, at any time, forbade Mr. Scanland to use valet parking or to claim reimbursement for such parking. (R. 358). Plaintiff testified that he often went in and out of parking lots on the same day on several occasions and that he generally used valet parking. Col. Lehner testified that the parking facilities at the Kel-Tek Building were bad. (R. 90). While management showed that parking rates for non-valet parking at the various locations at which plaintiff would have been required to pay for parking were such as to make it unlikely that he could have expended as much for non-valet parking as was claimed on his vouchers, there was no evidence that valet parking would not have produced the charge in the range of what was being claimed by plaintiff.

In two or three instances, trips of the plaintiff to Fort Monmouth or other facilities were shown to have produced a voucher claim for mileage substantially in excess of the "official mileage." Taken as a whole, this and the other evidence in the record do not constitute substantial evidence the plaintiff intentionally defrauded or attempted to defraud the government by the filing of false and fabricated claims.

While there is no doubt that there were errors in Mr. Scanland's vouchers in that the speedometer readings were in some instances incorrect, the Harbor Tunnel toll was claimed whereas plaintiff generally followed a longer route in which he did not use the Harbor Tunnel, the sequence of installations visited and the times of the visits on any given day were not necessarily correct, and a number of telephone calls were incorrectly claimed, the gravamen of the charge against him was not that the vouchers contained errors, but that they contained *intentional falsehoods in order to defraud.*

Intent, being a state of mind, can seldom be proved directly. Circumstantial evidence is generally utilized in both the civil and the criminal law to establish intent. The credibility of the person whose intent is being probed, however, is an important factor in the ultimate decision of the factfinder as to that intent in a case in which that person has testified.

Here the grievance examiner had the opportunity to hear the testimony of Mr. Scanland, Col. Johnson, the security officer, Mr. Walsh, and the private investigator, Mr. Brown. He was in a position to observe their demeanor and manner in testifying. Having done so, he found that Mr. Scanland did not submit false travel vouchers intending to defraud the government but that the false travel vouchers were submitted "because under the stress and strain of his work-load he neglected to maintain proper records and to submit such vouchers promptly." (R. 361). The grievance examiner further found:

"All testimony obtained from both the appellant [Scanland] and from management (including Mr. Scanland's supervisors) indicates that he was hard-working, under considerable strain, and working with a minimum of day to day supervision. In addition, management according to the testimony provided, made little effort to insure that Mr. Scanland submitted his travel vouchers more promptly than was his usual custom. This failure on management's part could be accepted by Mr. Scanland as inherent approval of his actions, i. e. assuming that his work took precedence over such administrative matters as submitting travel vouchers." (R. 361).

The mere fact that the grievance examiner, who had the opportunity to

see and hear the witness, resolved the issues of intent in favor of Mr. Scanland does not, of course, end the judicial inquiry. It does significantly influence, however, the judicial decision as to whether or not substantial evidence exists in support of a contrary view by the agency, particularly where, as here, the credibility of the testimony of Scanland and certain of the other witnesses was of vital importance in resolving the factual dispute relating to plaintiff's intent. As the Supreme Court has aptly stated in Universal Camera Corp. v. N. L. R. B.:

> "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." 340 U.S. at 496, 71 S.Ct. at 469.

The Regional Office of the Civil Service Commission agreed with the agency grievance examiner that the agency had not shown that plaintiff had falsely stated his presence at Fort Belvoir, that he was not entitled to any "in and around mileage" at any TDY stations or that the security records of the Kel-Tek Building reliably established plaintiff's presence or non-presence there. (R. 58–59). The Regional Office decision is substantially capsulized in the following sentence:

> "Although the agency, we find, has inconclusively established the appellant was not at Fort Belvoir, as is al-

leged, or that the appellant was entitled to no in and around mileage at all TDY stations, we feel that a general pattern of questionable mileage claims as well as excessive claims for telephone and parking fees has been established." (R. 58).

A general pattern of "questionable mileage" claims and "excessive" claims for telephone and parking fees, even if established, however, must be viewed in the light of the whole record to determine if a sufficient factual basis exists for inferring therefrom a fraudulent intent on the part of Mr. Scanland.

The BAR decision, made without the benefit of personal contact with the witnesses, stated that "it is questionable the use of a longer route can be justified in light of the great disparity of distance between claimed mileage and the official mileage." (R. 13–14). No evidence was produced by management, however, that the facts claimed by the plaintiff that the longer route was justified by time and traffic factors were incorrect. The BAR further noted that the plaintiff's claim for Harbor Tunnel fees was false. While the claim was false in most instances, the factual incorrectness of the claims for Harbor Tunnel fees does not establish automatically a fraudulent intent on the part of the plaintiff if, in fact, he believed that the inclusion of the Harbor Tunnel toll with a shorter mileage actually produced less of an expense claim for him than would have the longer mileage which he actually traveled. The BAR found it incredible that plaintiff could have been at the Kel-Tek facility on the dates when the records showed that he had not signed in. (R. 15). This, however, ignores the testimony of all of the witnesses that on occasion persons were in the facility without signing in and completely discounts the testimony of Col. Lehner of the many meetings which plaintiff, admittedly a hard worker and a successful project participant, attended.

Again, the BAR relied upon the non-valet parking rates to find that the in-

tentional overcharge for parking had been proved. Under different circumstances, perhaps such would justify the BAR's conclusion. However, in the light of the whole record, taking into consideration the extreme urgency and high priority nature of the work which was being done by plaintiff, his preoccupation with the work that he was doing, his excellent prior record for 25 years and his asserted desire to save time through the valet parking system, such evidence does not justify an inference of fraud.

The telephone-call matter, involving a relatively insignificant sum, was the most difficult for the plaintiff to explain. However, the plaintiff's explanation, taking into consideration the delay in time in which he filed his vouchers when viewed in the light of the whole record, is not, within itself, sufficient to establish the fraudulent intent on the part of the plaintiff.[2]

Finding as I do, in the light of the whole record, that the agency lacked substantial evidence to conclude that Mr. Scanland intentionally falsified information on his travel vouchers for the purpose of defrauding the government, the dismissal action of the agency based upon an assumption of fraud was unlawful and must be set aside. It is not necessary to decide, therefore, whether, under a separate standard, the action of the agency was arbitrary and capricious.

While finding that Mr. Scanland's dismissal was improper and that he must be reinstated, the court intimates no view on whether or not less drastic disciplinary action is warranted for failure to submit timely and accurate travel expense vouchers or for any other infractions of departmental rules and regulations. That decision lies with the agency in the first instance.

A decree will be entered in accord with the views expressed herein.

2. It should be noted that plaintiff was not the only member of this project who delayed in filing his expense voucher claims. Col. Lehner stated that he also filed his vouchers late on occasion because of his preoccupation with the project itself. (R. 85).