**TRANS–AMERICAN VAN SERVICE, INC.**

v.

**UNITED STATES of America and Interstate Commerce Commission**

and

**Associated Truck Lines, Inc., et al., Intervening Defendants.**

Civ. A. No. CA 4–74–25.

United States District Court,
N. D. Texas,
Fort Worth Division.

Aug. 26, 1976.

John C. Bradley, Rice, Carpenter & Carraway, Washington, D. C., for plaintiff.

Peter A. Fitzpatrick, James T. Proctor, Washington, D. C., for defendants.

Garrett & Nation, by John B. Garrett, Fort Worth, Tex., John C. Bradley, Rice, Carpenter & Carraway, Washington, D. C., for plaintiff.

Frank McCown, U.S. Atty., by Wm. L. Johnson, Jr., Fort Worth, Tex., James T. Proctor, Washington, D. C., for defendant.

Rawlings, Sayers & Scurlock, by Clayte Binion, Fort Worth, Tex., Paul F. Sullivan, Washington, D. C., for intervening defendants, Kenosha Auto Transport Corp., Dallas & Mavis Forwarding Co., Inc., Ace Doran Hauling & Rigging Co., Red Top Trucking Co., Inc.

Rawlings, Sayers & Scurlock, by Clayte Binion, Fort Worth, Tex., Robert E. Joyner, Joyner, Goff & Sims, P. C., Memphis, Tenn., for intervening defendants, Dealers Transit, Inc., C & H Transp. Co., Inc., Gordons Transports, Inc., International Transport, Inc., Superior Trucking Co., Inc.

Rawlings, Sayers & Scurlock, by Clayte Binion, Fort Worth, Tex., Wilmer B. Hill, Ames, Hill & Ames, P. C., Washington, D. C., for intervening defendant, Gregory Haulers, Inc.

Clayte Binion, Sayers, Scurlock, Binion & Brackett, Fort Worth, Tex., James M. Doherty, Doherty & Robertson, Austin, Tex., Michael J. Wyngaard, Aagaard, Nichol & Wyngaard, Madison, Wis., for intervening parties defendant and J. H. Rose Truck Line, Inc.

Before GOLDBERG, Circuit Judge, MAHON and PORTER, District Judges.

## OPINION

MAHON, District Judge.

This is an action for judicial review of an Interstate Commerce Commission decision. Plaintiff, Trans-American Van Service, Inc. [hereinafter "Trans-American"], seeks to have annulled and set aside orders of the Interstate Commerce Commission [hereinafter "ICC" or "Commission"] denying Plaintiff's application for a motor-vehicle common-carrier certificate authorizing the transportation of specified types of off-highway vehicles between all points in the United States. Jurisdiction and venue are properly vested in this District Court. 28 U.S.C. §§ 1336, 1398, & 2321–2325 (1970).[1]

Trans-American complains that the ICC acted arbitrarily and capriciously in failing to make adequate findings to support its ultimate conclusion, in failing to accord the proper significance to the Review Board's finding that Trans-American sustained its burden of proving a *prima facie* case, in denying its application on the basis of the broad scope of authority requested, and in considering the evidence submitted by five non-testifying "witnesses." Trans-American further complains that there is no substantial evidence on the record to support the Commission's conclusion that Plaintiff's application for a Certificate of Public Convenience and Necessity should be denied.

## I. BACKGROUND

*A. Trans-American's Proposed Service*

Trans-American is currently authorized to transport household goods and golf bug-

1. Public Law 93–584, which amended 28 U.S.C. §§ 1336, 1398, & 2321–2323 (1970) and repealed 28 U.S.C. §§ 2324–2325 (1970) to provide for review by a court of appeals, became effective on 2 January 1975, and does not apply to cases such as this that were filed before that date. Pub.L. 93–584 § 10.

gies non-radially between all points in the continental United States. It also holds authority to transport motorcycles radially from specified origins and is heavily engaged in the nationwide transportation of uncrated pianos and organs, typewriters, and dictating machines. Trans-American urges that its existing service is highly specialized to the needs of its particular shippers in that it provides for the following:

(1) The transportation of uncrated articles to avoid the cost of crating and problem of waste disposal at destination;

(2) Use of pads and blankets to protect uncrated and often fragile articles from damage during transportation;

(3) Carrier loading at origin;

(4) Carrier unloading at destination;

(5) Use of winches, powerlifts, ramps, and other devices to facilitate loading and unloading of large and bulky articles;

(6) Roll-on and roll-off loading and unloading of self-propelled vehicles;

(7) Multiple-stop pickup and deliveries to achieve more economical service by aggregation of smaller shipments into truckloads;

(8) Pickup and delivery at remote locations;

(9) Adjustable multi-level decking to facilitate layering of vehicles and other articles without the weight of one layer threatening damage to those below;

(10) Single-line or single-carrier service from origin to destination to promote expedition, tracing, and assignment of responsibility;

(11) Mixed loads of both crated and uncrated articles and of different commodities; and

(12) Use of closed vans to protect lading from highway dirt and grime during transportation.

Trans-American proposes to extend this specialized service to transportation over irregular routes, between all points in the continental United States, of the following commodities; off-highway vehicles, all-terrain vehicles, sports vehicles, and snowmobiles, commercial adaptations thereof, and parts, accessories, and attachments thereto.

Trans-American claims that the service it proposes will save the shippers, distributors, and retailers of the products in question significant time and expense, both directly in the manner of shipment, itself, and indirectly through simplification of the shipment procedure, by not requiring the shipping and receiving parties to maintain as many employees or as much special equipment. Trans-American further claims that its proposed service will deliver the products in question in a cleaner condition and with less chance of damage.

Trans-American asserts that its proposed service would be virtually unique in the industry into which Trans-American proposes to extend it. The record discloses that no existing carrier offers the entire panoply of specialized services that Trans-American has proposed,[2] and that few carriers currently offer any significant number of them. Trans-American has pointed out that a substantial number of the protestants cannot pretend to hold out the service that Trans-American proposes because they are "heavy haulers," which are limited to "size and weight" commodities heavier than the products that Trans-American proposes to carry.[3]

The protestants, several of which are Intervening Defendants here, claim generally that Trans-American's proposed service is an unexceptional compilation of "gimmicks." Intervening Defendants argue that Trans-American uses basically the same equipment as they, albeit somewhat modified, and that there is nothing unique

**2.** This fact was admitted by counsel for the ICC at oral argument.

**3.** With regard to the nature of "heavy haulers" and the limitation to "size and weight" commodities, *see Pittsburgh & New England Trucking Co. v. United States,* 345 F.Supp. 743 (W.D. Pa.1972), *aff'd* (1) *mem., sub. nom. United States v. ICC,* 409 U.S. 904, 93 S.Ct. 235, 34 L.Ed.2d 169 (1972), & (2) *mem., sub. nom. Ace Doran Hauling & Rigging Co. v. ICC,* 409 U.S. 1070, 93 S.Ct. 686, 34 L.Ed.2d 660 (1972).

about the pads, blankets, loading, unloading, etc., proposed by Trans-American. The protestants point out that it is unclear under the current state of the law exactly what is meant by a "heavy hauler," and that most of the protestants have such capabilities that they *could*, at least theoretically, offer the services that Trans-American has proposed. Indeed, one Intervening Defendant and protestant, Kenosha Auto Transport Corp., claims to hold out within its limited grant of authority a service substantially similar to that proposed by Trans-American, though from the record it appears that Kenosha uses open trailers instead of closed, padded vans, and does not provide carrier loading and unloading.

### B. Proceedings Before the Commission

On 21 October 1970, Trans-American filed an application with the ICC seeking a Certificate of Public Convenience and Necessity authorizing it, as a common carrier by motor vehicle, to transport non-radially over irregular routes and between all points in the continental United States, the off-highway, all-terrain sports and snow vehicles detailed above.[4] Trans-American's application was supported by thirty-one manufacturers and distributors of the involved commodities located in various parts of the United States, Canada, Japan, and Italy. Formal written protests to a grant of the application were filed on behalf of sixty-six carriers. Of these sixty-six original protesting carriers, twenty-eight offered evidence in opposition.

Trans-American's application was the subject of oral hearings held before two hearing examiners in May 1970 and December 1971. On 27 June 1972, the second hearing examiner served his report recommending that the application be denied on the grounds that Trans-American had failed to establish a *prima facie* case of public need for the service proposed. The final hearing examiner was of the opinion that Trans-American's proposed service would be advantageous and beneficial to the shippers in its use of padded vans, multiple-drop and direct-line service, and carrier loading and unloading. Nevertheless, the examiner thought that Trans-American had failed to adequately establish traffic volume figures and shipment frequency estimates. He concluded that, by so failing to produce specific factual data, Trans-American had also failed to demonstrate a public need for its proposed service.

In proceedings of this nature it cannot be gainsaid that the testimony of supporting shippers carries great importance. Numerically speaking the shipper support here, totalling more than 30, is impressive. But as the examiner has tried to emphasize throughout this discussion, it is the substance of that support rather than the sheer quantity of it, which is determinative. Because the essence of the support herein is characterized more by a desire for service embedded in the precatory comments of shippers, rather than an ascertainable need for the sought service, the examiner lacks any basis upon which to recommend an award of authority and so concludes this application should be turned down.[5]

A final, but important comment. This report contains no recitation of the evidence adduced by protestants, nor does it mention the arguments they advanced on brief. The exclusion has been deliberate. The recommendations reached have not been tied in any way to the evidence

---

4. On appeal within the ICC, Trans-American suggested the following possible restrictions to its proposed service;

(1) To exclude any vehicle exceeding 10,000 lbs.;

(2) To exclude any personnel or property carrying off-highway recreational and utility vehicles exceeding 3500 lbs.;

(3) To exclude all farm, grading, and excavating equipment;

(4) To territorially limit its non-radial authority with respect to snowmobiles to some forty states;

(5) To establish some thirteen radial points of origin for off-highway motorcycles, trailbikes, and minibikes; and

(6) To establish some eight radial points of origin for garden tractors.

5. *See* note 20 *infra*.

presented by protestants. This application falls, in the conviction of the examiner, of its own frailty. Wholly apart from what service the protestants may or may not be able to perform, no determinable need for TAVS' service can be uncovered. That being the case, no useful purpose would be served by a recitation of protestants' evidence. Cf. the *Dahn* and *Hyder* cases, *supra*. [*Richard Dahn, Inc. v. ICC,* 335 F.Supp. 337 (D.N.J.1971); *Clay Hyder Trucking Lines, Inc. Ext.—Meats & Foodstuffs,* 115 M.C.C. 600 (1972)].

Report and Order of Edward J. Reidy, Hearing Examiner, at 28–29 (5 June 1972).

The Report of the Commission, Review Board No. 3, 15 January 1973, on Trans-American's timely appeal, also proposed denial of the application, but on significantly different grounds. The Review Board held that Trans-American had indeed established a *prima facie* case of public need for service, but then concluded that Trans-American had not met its "ultimate burden of proof" of going "forward with the evidence to show convincingly that the protestants' existing service will not adequately meet shippers' need for service." Additionally, in support of, and as an alternative to, its finding of a failure to go forward with the evidence, the Review Board concluded that the broad nationwide authority sought by Trans-American had not been shown to be required by the public convenience and necessity.

The Administrative Law Judge recommended that the application be denied, generally on the ground that the evidence in support of the application does not meet the minimum legal requirement to justify a grant of motor carrier authority, citing *Novak Contract Carrier Application,* 103 M.C.C. 555, and other cases, and therefore, applicant has failed to establish a prima facie case.

\* \* \* \* \* \*

. . . [W]e believe that the quality and quantity of the evidence adduced by applicant and supporting witnesses at the hearing is far superior to that presented by the supporting witnesses in the *Novak* case, *supra,* 103 M.C.C. 555 (1967), and in *Richard Dahn, Inc. v. I. C. C.,* 335 F.Supp. 337 (1971), and *Clay Hyder Trucking Lines, Inc., Extension—Meats and Foodstuffs,* 115 M.C.C. 600 (1972), also cited in the recommended report and order upon which the Administrative Law Judge apparently gave considerable reliance as reason to support his conclusion. In these cited proceedings the supporting shippers failed to clearly identify the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and deficiencies in existing services. It was concluded in each proceeding, therefore, that applicant had failed to establish a prima facie case, and a discussion of protestants evidence would serve no useful purpose. That is not the situation in the instant proceeding,[6] and we are persuaded that the record is sufficient to establish a prima facie case. However, in the face of protestants' evidence, which was not otherwise discussed in the recommended report, we will conclude that applicant has not met its ultimate burden of proof. The Administrative Law Judge's statement of facts, however, is found to be accurate in all material respects and, as supplemented herein, it is adopted as our own.

\* \* \* \* \* \*

In a proceeding of this nature, the applicant must first establish by competent evidence that a public need exists for the service it proposes. If an applicant meets that initial burden protestants must come forward and show the extent to which they can fulfill all or part of such need. At that point, the applicant must go forward with the evidence to show convincingly that the protestants' existing service will not adequately meet shippers' need for service, since an applicant always has the ultimate burden of proof.

\* \* \* \* \* \*

---

**6.** *See* note 29 *infra.*

Our analysis of applicant's evidence compels the conclusion that a prima facie case of need was established. Thus we differ with the Administrative Law Judge in that aspect of the case. However, we do agree that the application should be denied. Our determination to deny is based upon the quality of the applicant's evidence, the broad scope of the application, and the fact that the protestants' existing services have not been shown to be inadequate *vis a vis* the extent to which they can fulfill portions of the unlimited, nationwide request for service. Applicant's evidence lacks sufficiency to justify a grant of authority in the face of a showing by protestants of their substantial ability and willingness to meet the generalized needs of shippers.[7] Furthermore, we note that in a situation where an applicant chooses to apply for and pursue an extremely broad request for authority, the Commission is under no obligation to initiate the carving-out of some lesser service which might possibly be warranted based upon consideration of selected parts of the record. Compare *Great Northern Ry. Co. Extension—Ex Rail Cement*, 96 M.C.C. 679, 707. Here, applicant has chosen to stand by its request for nationwide authority,[8] and in the absence of persuasive evidence that shippers realistically need service which cannot be met by the rea-sonably adequate existing operations of protestants, the application must be denied.

Report of the Commission, Review Board No. 3, at 2–6 (15 Jan. 1973).

Trans-American subsequently filed a petition for reconsideration and for a finding of general transportation importance, both of which were denied.

## II. SCOPE OF JUDICIAL REVIEW

### A. Standards of Review of Administrative Action

The Administrative Procedure Act provides that the reviewing court shall set aside agency actions and conclusions that are (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or (2) "unsupported by substantial evidence."[9] 5 U.S.C. § 706(2)(A) & (E). These two provisions of the Administrative Procedure Act are separate standards of review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). An agency's finding, therefore, may reflect arbitrary and capricious action even though it is supported by substantial evidence. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Midwest Coast Transport, Inc. v. United States*, 391 F.Supp.

---

7. *See* note 29 *infra.*

8. *Cf.* note 4 *supra.*

9. "Substantial evidence" has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It is that amount of evidence that would "justify, if the trial were to a jury, a refusal to direct a verdict." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Under this standard, the reviewing court will not reweigh the evidence, nor become concerned with the agency's reasoning or with the wisdom of its decisions. The reviewing court will sustain the order of an agency based on substantial evidence even if it disagrees with the agency's conclusions or considers them contrary to the weight of evidence. *Illinois C. R. R. v. Norfolk & W. Ry.*, 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); *Consolo, supra,* 383 U.S. at 619–621, 86 S.Ct. 1018; *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1945); *Virginian Ry. v. United States*, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926). Nevertheless, a substantial-evidence review includes consideration of the entire record—all the evidence, both that supporting and that undermining the agency's determination. "The substantiality of the record must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951), recently reaffirmed in *Bowman Transportation, infra,* 419 U.S. at 284 n.2, 95 S.Ct. 438; *Scanland, infra* 389 F.Supp. at 69. *See* K. Davis, Administrative Law Text § 29.02 (3d ed. 1972).

1209, 1211–1212 (D.S.D.1975); *Scanland v. United States Army Test & Evaluation Command, Dept. of Army,* 389 F.Supp. 65, 69 (D.Md.1975).

The Supreme Court has recently summarized the "arbitrary and capricious" standard of judicial review.

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." . . . The agency must articulate a "rational connection between the facts found and the choice made." . . . While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transportation, supra,* 419 U.S. at 285–286, 95 S.Ct. at 442 (citations omitted).

■ The agency must also provide a rational and reasonable basis for deviating from its established policy.

> . . . [The] law does not permit an agency to grant to one person the right to do that which it denies another similarly situated. There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case.

*Mary Carter Paint Co. v. FTC,* 333 F.2d 654, 660 (5th Cir. 1964) (Brown, J., concurring), *rev'd on other grounds,* 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965); *Squaw Transit Co. v. United States,* 402 F.Supp. 1278, 1287 (N.D.Okl.1975).

**B. Judicial Review of ICC Decisions**

The Interstate Commerce Act, 49 U.S.C. § 306(a)(1), provides that a Certificate of Public Convenience and Necessity is required for any common carrier by motor vehicle subject to the Act to engage in any interstate operation.

Section 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a), provides in pertinent part that

> . . . a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . . .

■ Nowhere does the Interstate Commerce Act define the term "public convenience and necessity." [10] It is clear that Congress intended the Commission to have broad discretion in determining where "public convenience and necessity" lies. *Bowman Transportation, supra,* 419 U.S. at 297, 95 S.Ct. 438; *Schaffer Transportation Co. v. United States,* 355 U.S. 83, 88, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957); *United States v. Detroit & Cleveland Navigation Co.,* 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945); *ICC v. Parker,* 326 U.S. 60, 65–66, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945); *Denver & R. G. W. R. R. v. United States,* 312 F.Supp. 329, 332–333 (D.Colo.1970), *aff'd mem.,* 400 U.S. 921, 91 S.Ct. 188, 27 L.Ed.2d 182.

■ The ICC's discretionary decisions must be guided, however, by the National Transportation Policy. [11] The Supreme

---

10. For a discussion of the statutory evolution of the term "public convenience and necessity," and the intention of Congress in using the term in the Interstate Commerce Act, *see ICC*

*v. Parker,* 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945).

11. 49 U.S.C. preceding § 1 provides:

Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured. *Schaffer Transportation, supra,* 355 U.S. at 87–88, 78 S.Ct. 173, and cases cited therein. The expertise of the ICC is called into play in those situations where the broad generalizations of the National Transportation Policy overlap. *Parker, supra,* 326 U.S. at 66, 65 S.Ct. 1490.

■■■■ Yet, in even these overlapping areas, the Commission's expertise is not sufficient to support a conclusion by itself without the application of proper law. *ICC v. J–T Transport Co.,* 368 U.S. 81, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961). A reviewing court should uphold an order of the ICC only where the ICC has applied the proper legal standards and reasoning in reaching its conclusion. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1952); *Frozen Food Express v. United States,* 280 F.Supp. 661, 663 (N.D.Tex.1968) [hereinafter *"Frozen Food Express (II)"*]. The Commission must support its ultimate conclusion with adequate findings based on the National Transportation Policy. *Burlington Truck Lines, supra,* 371 U.S. at 167–168, 83 S.Ct. 239; *Schaffer Transportation, supra,* 355 U.S. at 87–92, 78 S.Ct. 173.

## C. Adequate Subordinate Findings

■■■ The Administrative Procedure Act requires that all agencies' decisions include "findings and conclusions, and the reasons or a basis therefor, on all material issues of fact, law, or discretion." 5 U.S.C. § 557(c)(A). Thus, the Commission must state not only its ultimate findings of fact

as to public convenience and necessity, but also must articulate the basis factual findings underlying its ultimate conclusion. *See* K. Davis, Administrative Law Text § 16.04 (3d ed. 1972); *Atchison, T. & S. F. Ry. v. United States,* 295 U.S. 193, 201–202, 55 S.Ct. 748, 79 L.Ed. 1382 (1935). And these subordinate findings must be adequate to support its ultimate conclusion; otherwise, the order of the Commission is deemed arbitrary and capricious. *Bell Lines, Inc. v. United States,* 263 F.Supp. 40, 45 (S.D.W.Va.1967); *Campbell Sixty-Six Express, Inc. v. United States,* 258 F.Supp. 529, 535 (W.D.Mo.1966); *Nashua Motor Express, Inc. v. United States,* 230 F.Supp. 646, 650 (D.N.H.1964).

There can be no precise delineation of how detailed or complete these subordinate findings must be to be "adequate." "[T]he basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented." *Alabama G. S. R. R. v. United States,* 340 U.S. 216, 227–228, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951).

Predictably enough, the variability of this procedural requirement has produced grossly general and conflicting judicial pronouncements. The questions of how much detail is necessary and of how much muteness on the part of the Commission is tolerable have been the bases of much litigation. *See C–Line, Inc. v. United States,* 376 F.Supp. 1043, 1053 (D.R.I.1974).

■■■■ At a minimum, the logical processes of the Commission in reaching its conclusion must be reasonably discernable, *Bowman Transportation, supra,* 419 U.S. at 286, 95 S.Ct. 438; *American Iron & Steel*

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or

destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

*Institute v. EPA*, 526 F.2d 1027, 1077 (3d Cir. 1975), and there must be sufficient findings or analysis to enable the reviewing court to ascertain whether the Commission properly applied the law and to justify the choice that the Commission made, *Burlington Truck Lines, supra*, 371 U.S. at 167, 83 S.Ct. 239; *Frozen Food Express (II)*, 280 F.Supp. at 663. On the other hand, the Commission need not make findings of fact as detailed as those required by the Federal Rules of Civil Procedure. *Armored Carrier Corp. v. United States*, 260 F.Supp. 612, 615 (E.D.N.Y.1966), aff'd per curiam, 386 U.S. 778, 87 S.Ct. 1476, 18 L.Ed.2d 524 (1967); *Luckenbach S. S. Co. v. United States*, 122 F.Supp. 824, 827 (S.D.N.Y.1954), aff'd per curiam, 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120 (1954). The amount of specificity required under the Administrative Procedure Act is ultimately a question of reasonableness: the Commission must disclose those subordinate findings that form the essential basis of its decision. *Alabama G. S. R. R., supra*, 340 U.S. at 227–228, 71 S.Ct. 264; *Lemmon Transport Co. v. United States*, 393 F.Supp. 838, 841 (W.D.Va.1975). Unless the essential basic findings are revealed, the reviewing court cannot determine whether there is substantial evidence to support the ultimate conclusion. Of course, the Commission need not be absolutely specific, nor need it always annotate each subordinate finding with the evidence supporting it. *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 529, 66 S.Ct. 687, 90 L.Ed. 821 (1945); *United States v. Baltimore & O. R. R.*, 293 U.S. 454, 463, 55 S.Ct. 268, 79 L.Ed. 587 (1935). The Commission's action must be upheld, if at all, on the same bases as those articulated in the order; neither the reviewing court nor appellate council may search the record to supply *post hoc* rationalizations that the Commission itself

has not articulated as a basis for its result. *Burlington Truck Lines, supra*, 371 U.S. at 168–169, 83 S.Ct. 239; *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Atchison, T. & S. F. Ry., supra*, 295 U.S. at 201–202, 55 S.Ct. 748 (1935). *Cf. Feature Film Service, Inc. v. United States*, 349 F.Supp. 191, 201 (S.D. Ind.1972). Otherwise, the reviewing court would be either infringing on the expert discretion of the Commission or allowing that discretion to roam arbitrarily.[12] Neither general, ambiguous statements nor peripheral announcements are sufficient to justify logical leaps to hypothetical alternative dispositions without the requisite subordinate findings. *Atchison T. & S. F. Ry., supra*, 295 U.S. at 201–202, 55 S.Ct. 748; *Nashua Motor Express, supra*, 230 F.Supp. at 650.

### D. Assessment of Relevant Factors

The broad expert discretion of the Commission and the lack of a congressional definition of "public convenience and necessity" do not indicate that there are no factors that the Commission must consider in determining applications for common-carrier certificates. Since *Citizens to Preserve Overton Park, supra*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, when faced with arbitrary and capricious administrative action, the lower federal courts have identified relevant factors by translating the purposes of the underlying statutory authorization into the precise factual context before the court. *Smith v. FTC*, 403 F.Supp. 1000, 1007–1008 (D.Del.1975). *See Transcontinental Gas Pipe Line Corp. v. FPC*, 160 U.S.App.D.C. 1, 488 F.2d 1325, 1329–1330 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226 (1974); *Getty Oil Co. (Eastern Operations), Inc. v. Ruckelshaus*, 467 F.2d 349, 355 & 357 (3rd Cir. 1972), cert. denied, 409 U.S.

---

**12.** A third practical reason for administrative findings is that findings help protect against careless or arbitrary action. Judge Jerome Frank gave this element first place: "It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of upper courts. While it does serve that end, it has a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts. . . .

Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper." [citing *United States v. Forness*, 125 F.2d 928, 943 (2d Cir.), cert. denied, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942)].

K. Davis, *supra*, § 16.03 at 321–322.

1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973); *Hanly v. Mitchell,* 460 F.2d 640, 646–648 (2d Cir. 1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). Such identification of relevant factors is not judicial intrusion into the domain of agency discretion and expertise, but rather an undertaking designed to protect the exercise of agency discretion by providing a legal framework of statutorily emanating guidelines and standards within which such discretionary authority must be exercised. *Smith v. FTC, supra,* 403 F.Supp. at 1007–1008. *See Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C.. 74; 439 F.2d 584, 597–598 (1971). *See generally* K. Davis, *supra,* §§ 6.05 & 16.05.

An ICC decision concerning issuance of a Certificate of Public Convenience and Necessity is based on adequate subordinate findings only if the order and report reflect that the Commission considered all relevant factors. *Schaffer Transportation, supra,* 355 U.S. at 88–91, 78 S.Ct. 173; *Feature Film Service, supra,* 349 F.Supp. at 201–202; *Frozen Food Express (II),* 280 F.Supp. at 663; *Nashua Motor Express, supra,* 230 F.Supp. at 650.

■ The Commission must draw its conclusion from the total situation, taking into account the infinite variety of circumstances that may occur in specific instances. *Detroit & Cleveland Navigation, supra,* 326 U.S. at 241, 66 S.Ct. 75; *Parker, supra,* 326 U.S. at 65, 65 S.Ct. 1490; *Red Ball Motor Freight, Inc., v. Herrin Transportation Co.,* 98 F.Supp. 248, 250 (N.D.Tex.1950), *aff'd per curiam,* 341 U.S. 938, 71 S.Ct. 1002, 95 L.Ed. 1365 (1951); *Lang Transportation Corp. v. United States,* 75 F.Supp. 915, 927 (S.D.Cal.1948). A determination of an application for a Certificate of Public Convenience and Necessity will normally require the consideration of a variety of interrelated public-interest factors. *C–Line, supra,* 376 F.Supp. at 1052–1054; *Yellow Forwarding Co. v. ICC,* 369 F.Supp. 1040, 1045–1046 (D.Kan.1973); *Denver & R. G. W. R. R., supra,* 312 F.Supp. at 332–333; *Nashua Motor Express, supra,* 230 F.Supp. at 653; *A. B. & C. Motor Transportation Co. v. United States,* 69 F.Supp. 166, 169–170 (D.Mass. 1946). Generally, no one element or factor will be controlling, unless the particular circumstances of the case narrow the relevant considerations to one issue.[13] *Lemmon Transport, supra,* 393 F.Supp. at 842; *Nashua Motor Express, supra,* 230 F.Supp. at 653.

■ The issue before the Commission on an application for a grant of authority as a common carrier by motor vehicle is not whether the protestants' service meets some absolute standard of performance, but whether the public convenience and necessity would be promoted by the entry of the applicant in the markets already served by the protestants. *Bowman Transportation, supra,* 419 U.S. at 288, 95 S.Ct. 438; *United States v. Dixie Highway Express, Inc.,* 389 U.S. 409, 411–412, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967). Hence, the issue of inadequacy of existing service is only one element to be considered; it is not convertible to the ultimate issue of public convenience and necessity. *Schaffer Transportation, supra,* 355 U.S. at 90–91, 78 S.Ct. 173; *Lemmon Transport, supra,* 393 F.Supp. at 841–842; *Yellow Forwarding, supra,* 369 F.Supp. at 1045–1046; *Feature Film Service, supra,* 349 F.Supp. at 201–202; *Younger Bros. v. United States,* 289 F.Supp. 545, 547–548 (S.D. Tex.1968); *Nashua Motor Express, supra,* 230 F.Supp. at 653. A showing of inadequacy of existing service is neither indispensible for, nor a condition precedent to, a grant of authority. *Slay Transportation Co. v. United States,* 353 F.Supp. 555, 560 (E.D.Mo.1973); *Nashua Motor Express, supra,* 230 F.Supp. at 653. It is to be given no more weight than any other element. *Union Mechling Corp. v. United States,* 390 F.Supp. 411, 430 (W.D.Pa.1974). To hold

---

13. A comparable rationale is the basis for the well-established rule that the ICC cannot atomize, product by product, the prior service of an applicant under the "grandfather clause" of the Interstate Commerce Act, 49 U.S.C. § 306(a).

*United States v. Carolina Freight Carriers Corp.,* 315 U.S. 475, 483–484, 62 S.Ct. 722, 86 L.Ed. 971 (1942); *Frozen Foods Express v. United States,* 219 F.Supp. 131, 138 (N.D.Tex. 1963).

otherwise would be to vest the existing carriers with a property right to protection from competition, a notion that has been specifically rejected. *Dixie Highway Express, supra,* 389 U.S. at 411–412, 88 S.Ct. 539; *Schaffer Transportation, supra,* 355 U.S. at 90–91, 78 S.Ct. 173; *Lang Transportation, supra,* 75 F.Supp. at 930–931.

 Shortly after the enactment of the Motor Carrier Act, the Commission established certain guidelines setting forth elements that must be shown in order to prove that public convenience and necessity required a proposed service. In *Pan American Bus Lines Operation,* 1 M.C.C. 190, 203 (1936), the Commission stated:

> . . . The question, in substance, is *[1]* whether the new operation or service will serve a useful public purpose, responsive to the public demand or need; *[2]* whether this purpose can and will be served as well by existing lines or carriers; and *[3]* whether it can be served by applicant with the operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.

The *Pan American* guidelines have found considerable support in the reviewing courts. *See, e. g., Warren Transport, Inc. v. United States,* 525 F.2d 148, 149 (8th Cir. 1975); *Lemmon Transport, supra,* 393 F.Supp. at 841–842. To the extent that the three *Pan American* criteria are treated as merely *guidelines* for the "typical case," they serve a useful purpose and present no arbitrary and capricious action. When the *Pan American* criteria are interpreted, however, as has been argued before this Court, to be indispensable elements of proof or factors for consideration necessarily entitled to great weight, despite the factual context from which the application arises, they distort the totality of the situation before the Commission, constitute arbitrary and capricious action, and must be rejected.

### III. PARTICULAR INDICATIVE FACTORS

Since the relevant factors to a Commission decision regarding issuance of a Certificate of Public Convenience and Necessity are infinitely variable and must be applied on a case by case basis, an exhaustive listing of possible factors is impossible. In order to avoid a blind remand, however, the Court will briefly respond to several issues raised by the Report and Order of the Hearing Examiner, by the Report of Review Board No. 3, and in the briefs and argument on appeal, by discussing a few types of possibly indicative factors.[14]

### A. Competition

 The National Transportation Policy requires that the Commission both "foster sound economic conditions in transportation and among the several carriers" and guard the industry against "unfair or destructive competitive practices." 49 U.S.C. preceding § 1. The courts have generally construed this policy to mean that, absent contraindicative factors, competition is to be considered a healthy and desirable feature even in regulated industries.

The first appeal from an ICC decision in which the Supreme Court squarely addressed the issue of desirability of competition was *ICC v. Parker,* 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). In *Parker,* the ICC had issued a restricted certificate of authority, but the district court enjoined enforcement of the ICC order on the ground that no showing had been made that existing transportation facilities were inadequate to efficiently serve the needs of the public. In reversing the decision of the district court, the Supreme Court stated:

> . . . Since, however, on adequate evidence the Commission found that the motor service sought was of a different character from the existing motor service

14. This discussion is in no way intended to inhibit the expert discretion of the Commission in determining what factors are relevant. And, of course, there will be indicative factors relevant to other factual settings that are not relevant to the present situation and which are not

discussed in this opinion. *See, e. g., Union Mechling v. United States,* 390 F.Supp. 391, 395–396 (W.D.Pa.1974) (holding that the comprehensiveness of the congressional policy to regulate transportation can be a necessary element to consider).

and not directly competitive or unduly prejudicial to the already certificated motor carriers, 42 M.C.C. 725–26, we hold that the Commission had statutory authority and administrative discretion to order the certificate to issue. *The public is entitled to the benefits of improved transportation.* Where that improvement depends in the Commission's judgment upon a unified and limited rail-truck operation which is found not "unduly prejudicial" to motor carrier operations, the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service.

326 U.S. at 69–70, 65 S.Ct. at 1495 (emphasis added).

Under a narrow reading, *Parker* could be limited to the proposition that Congress had directed the Commission to "recognize and preserve" the different *modes* of transportation.[15] *See Parker, supra,* 326 U.S. at 74, 65 S.Ct. 1490 (Douglas, J., dissenting).[16]

But in a recent case, *Bowman Transportation, Inc. v. Arkansas-Best Freight, Inc.,* 419 U.S. 381, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), a unanimous decision authored by Justice Douglas, the Supreme Court strongly endorsed competition within the same mode of transportation as an aid in the attainment of the objectives of the National Transportation Policy.

The Commission's approach, . . . was more congenial [than the hearing examiners'] to the new entry and the resulting competition. This is the Commission's prerogative in carrying out its mandate to insure "safe, adequate, economical, and efficient service," [National Transportation Policy, preceding] 49 U.S.C. § 1. The Commission . . . could conclude that the benefits of com-

petitive service to consumers might outweigh the discomforts existing certificated carriers could feel as a result of new entry. Our decisions have dispelled any notion that the Commission's primary obligation is the protection of firms holding existing certificates. *ICC v. J–T Transport, supra* disapproved the proposition that shippers must take their grievances through complaint procedures before improvement through new entry is permitted. And in *United States v. Dixie Express,* 389 U.S. 409 [88 S.Ct. 539, 19 L.Ed.2d 639] (1967), we rejected the suggestion by a reviewing court that existing carriers have "a property right" to an opportunity to make amends before new certificates issue. *Id.,* at 411 [88 S.Ct. 539].

A policy in favor of competition embodied in the laws has application in a variety of economic affairs. *Even where Congress has chosen government regulation as the primary device for protecting the public interest, a policy of facilitating competitive market structure and performance is entitled to consideration.* The Commission, of course, is entitled to conclude that preservation of a competitive structure in a given case is overridden by other interests. *United States v. Drum,* 368 U.S. 370, 374–375 [82 S.Ct. 408, 410, 7 L.Ed.2d 360] (1962), but where, as here, the Commission concludes that competition "aids in the attainment of the objectives of the national transportation policy," *McLean Trucking Co. v. United States, supra,* 321 U.S. [67], 85–86, [64 S.Ct. 370 at 380, 88 L.Ed. 544 (1944)], we have no basis for disturbing the Commission's accommodation.

419 U.S. at 297–299, 95 S.Ct. at 448 (emphasis added; footnotes and citations omitted).

15. *I.e.,* to maintain healthy economic conditions in both the motor and rail transportation industries.

16. Justice Douglas, however, apparently felt even more strongly about the need for competition than did the majority of the Court. Inferring elements of anti-trust policy into the regulated world of the ICC, he stated:

The preservation of healthy competitive conditions must therefore be an ingredient of "public convenience and necessity" which the Commission is under the duty to determine in issuing certificates under § 207(a) [of the Interstate Commerce Act].
326 U.S. at 76, 65 S.Ct. at 1498.

In light of *Bowman,* the Seventh Circuit has asserted that there is a basic federal policy in favor of competition. *Corning Glass Works v. F. T. C.,* 509 F.2d 293, 302 (7th Cir. 1975). The *Bowman* decision, however, must be read in light of the Supreme Court's earlier opinion in *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953).[17] In that case, the Federal Communications Commission, over the opposition of a competitor, had authorized a radio-telegraph company to open two new overseas circuits. The Commission had concluded that duplicate facilities should be authorized because the national policy in favor of competition dictated that where competition was reasonably feasible, it was in the public interest. In reversing the FCC, the Supreme Court discussed at length the qualified nature of the policy in favor of competition in administrative decisions involving regulated industries.

That there is a national policy favoring competition cannot be maintained today without careful qualification. It is only in a blunt, undiscriminating sense that we speak of competition as an ultimate good. . . .

\* \* \* \* \* \*

. . . The very fact that Congress has seen fit to enter into . . . comprehensive regulation . . . contradicts the notion that national policy unqualifiedly favors competition . . . . [I]t is for us to recognize that encouragement of competition as such has not been considered the single or controlling reliance for safeguarding the public interest.

Of course, the fact that there is substantial regulation does not preclude the regulatory agency from drawing on competition for complementary or auxiliary support. Satisfactory accommodation of the peculiarities of individual industries to the demands of the public interest necessarily requires in each case a blend of private forces and public intervention.

. . . But this merely reinforces our conclusion that it is improper for the Commission to suppose that the standard it has adopted is to be derived without more from a national policy defined by legislation and by the courts. Had the Commission clearly indicated that it relied on its own evaluation of the needs of the industry rather than on what it deemed a national policy, its order would have a different foundation. *There can be no doubt that competition is a relevant factor in weighing the public interest. Cf. McLean Trucking Co. v. United States,* 321 U.S. 67, 86–88 [64 S.Ct. 370, 380–381, 88 L.Ed. 544]. Our difficulty arises from the fact that while the Commission recites that competition may have beneficial effects, it does so in an abstract, sterile way. Its opinion relies in this case not on its independent conclusion, from the impact upon it of the trends and needs of this industry, that competition is desirable but primarily on its reading of national policy, a reading too loose and too much calculated to mislead in the exercise of the discretion entrusted to it.

346 U.S. at 91–95, 73 S.Ct. at 1003 (emphasis added; footnotes and citations omitted).

 Thus, it is clear that competition is a strong and pervasive factor to be considered by the ICC in determining whether the grant of an application would further the National Transportation Policy. *Lemmon Transport, supra,* 393 F.Supp. at 842; *Petroleum Carrier Corp. v. United States,* 258 F.Supp. 611, 614–617 (M.D.Fla.1966); *Nashua Motor Express, supra,* 230 F.Supp. at 652–653; *Smith & Soloman Trucking Co. v. United States,* 120 F.Supp. 277, 279–280 (D.N.J.1954). The presumption that competition will aid in the attainment of the objectives of the National Transportation Policy must be "overridden by other interests." *Bowman Transportation, supra,* 419 U.S. at 298–299, 95 S.Ct. 438. Where an agency, based upon its own expert knowl-

---

**17.** The continuing validity of *RCA Communications,* however, is somewhat doubtful. Reference to the *RCA Communications* Court's ex-

tensive discussion of the role of competition in regulated industries was conspicuously absent from the *Bowman* opinion.

edge of the industry under its control, determines that competition in and of itself is a desirable objective, that agency determination must be upheld. *Eastern Air Lines, Inc. v. CAB,* 271 F.2d 752, 759 (2d Cir. 1959); *Petroleum Carrier, supra,* 258 F.Supp. at 614–617.

In the case now before the Court, there is no indication in the Report of the Commission that it considered the elemental policy favoring competition and rejected it either as not relevant or as overridden by other considerations. The need for competition, of course, is directly related to the inherent advantages of the proposed service, inversely related to the consideration of adequacy of existing service, and closely tied to the concern for the economic condition of the industry. The Commission did make a finding that the protesting carriers had "substantial ability and willingness to meet the generalized needs of shippers." This statement is so vague and conclusory that it fails to reveal any hint of analysis by the Commission of the policy favoring competition in the factual setting of this case. Taken in context, this finding is clearly based on the one element of inadequacy of service.

### B. Sound Economic Conditions

The National Transportation Policy imposes on the Commission a duty "to . . . foster sound economic conditions in transportation and among the several carriers." 49 U.S.C. preceding § 1. Thus, the Commission must always consider the public interest in maintaining the health and stability of the industry. *Bowman Transportation, supra,* 419 U.S. at 293, 95 S.Ct. 438; *Dixie Highway Express, supra,* 389 U.S. at 411, 88 S.Ct. 539.

Industry-wide economic considerations are intertwined with analyses of competition, existing services, and future needs. A sound economic condition is not necessarily opposed to the policies favoring competition and different services. Indeed, in the proper factual context, the entry of a competitor into the market may well promote the health, welfare, and stability of the industry.

It is manifest, therefore, that the term "sound economic condition" is not logically convertible to that of "adequate existing service." The fact that services are adequate does not mean that the economic conditions of the industry will be impaired by the entry of a new carrier into the field. *See Parker, supra,* 326 U.S. at 69–73, 65 S.Ct. 1490. Conversely, the fact that existing services are inadequate still admits of some other reason for determining that the health and welfare of the industry opposes the entry of a new carrier or service. *See Town of Montague v. United States,* 306 F.Supp. 1227, 1229 (D.Mass.1969) (upholding an ICC decision denying a proposed bus-line service to a small town on the ground of too little potential use, despite the fact that no bus line currently served the town).

Again, there is nothing in the present Report of the Commission to indicate that it considered any other aspect of the health and welfare of the industry other than the simple adequacy of existing service.

### C. Adequacy of Existing Service

The National Transportation Policy constrains the ICC "to promote safe, adequate, economical, and efficient service." 49 U.S.C. preceding § 1. Neither the National Transportation Policy nor the Interstate Commerce Act uses the term "(in)adequacy of existing service." Hence, this factor is not an ultimate finding to be made by the Commission and cannot be used to immediately justify a given outcome. It is, instead, a basic or intermediate determination. *See* K. Davis, *supra,* § 16.04. As previously discussed, the element of adequacy of existing service is not coextensive with that of public convenience and necessity, the sound economic welfare of the industry, or the qualified policy in favor of competition.

Nevertheless, the determination of the adequacy of existing service is an important way station on the journey to several ultimate conclusions. Indeed, the question of how much significance to attach to this one

factor appears to have been the central issue in most litigation over ICC determinations of public convenience and necessity. *Nashua Motor Express, supra,* 230 F.Supp. at 652.

As previously discussed, it is impossible to state, outside the context of a particular case, the relative weight to be given different factors, and the Commission cannot arbitrarily assign a great or absolute value to the issue of inadequacy of existing service. It is possible that public convenience and necessity might require the issuance of a certificate even though no finding were made as to inadequacy of service and even though existing carriers might arrange to furnish the proposed services. *Dixie Highway Express, supra,* 389 U.S. at 411–412, 88 S.Ct. 539; *Parker, supra,* 326 U.S. at 69–70, 65 S.Ct. 1490.

There is a substantial line of cases setting forth the platitude that a showing of inadequacy of existing services is a "basic ingredient" to a favorable determination of public convenience and necessity. *E. g., Warren Transport, supra,* 525 F.2d at 149; *Lemmon Transport, supra,* 393 F.Supp. at 841–842; *Feature Film Service, supra,* 349 F.Supp. at 201; *Lester C. Newton Trucking Co. v. United States,* 264 F.Supp. 869, 885 (D.Del.1969), *aff'd per curiam,* 389 U.S. 30, 88 S.Ct. 108, 19 L.Ed.2d 29 (1967); *Zuzich Truck Lines, Inc. v. United States,* 224 F.Supp. 457, 468 (D.Kan.1963). Most of these cases rely on the *Pan American* criteria and note that even though inadequacy of service is a "basic ingredient," it is not the sole test. To the extent that the term "basic ingredient" denotes that the question of adequacy of existing service is a possibly important factor to consider, this line of cases is certainly correct. But if these cases are interpreted to mean that the question of the adequacy of existing service is abstractly entitled to inordinately great weight in determining public convenience and necessity, then their reasoning must be rejected.

The majority of cases holding that a showing of inadequacy of existing services is a necessary or inordinately important factor in establishing public convenience and necessity can be distinguished on their facts. Where an applicant's proposed service is in no way unique or different from that of existing carriers, the entire basis of his application is inadequacy, and that obviously becomes the controlling issue. The vast majority of cases cited by the ICC do not involve applications for services that are substantially different from existing services. They involve tacking, simple extensions, or applications to provide substantially similar service to that which is already offered. In such a typical case, inadequacy of existing services is an adequate guideline for the National Transportation Policy. *Feature Film Service, supra,* 349 F.Supp. at 201–202. *See also Lester C. Newton Trucking, supra,* 264 F.Supp. at 886.

In the present case, as in innumerable others, the Commission has denied Plaintiff a Certificate of Public Convenience and Necessity on the ground that Plaintiff has not shown the existing services of the protestants to be inadequate. The Commission has simply announced this intermediate finding without any indication of how it was reached. The Court is thus faced with a problem of semantics. Did the Commission, by the term "inadequacy of existing services," intend to refer to the totality of the elements that in combination go to make up broad notion of public convenience and necessity? Or, on the other hand, did the Commission merely look at the narrow issue of the existing carriers' ability to move the type of freight in question? If the Commission had considered all the relevant factors and determined that Plaintiff's proposed service was not unique nor substantially different from the existing services, this Court would, perhaps, find its conclusion of law to be supportable. But to reject an application purely on the ground that existing carriers have the simple ability to move the traffic available would be impermissible.[18] *Schaffer Trans-*

---

18. To allow the Commission to deny a Certificate of Public Convenience and Necessity solely on the ground of the ability of existing carriers to move the goods in question would be

*portation, supra,* 355 U.S. at 90–91, 78 S.Ct. 173.

This question of semantics is a nagging problem of long duration. *See, e. g., Feature Film Service, supra,* 349 F.Supp. at 201 n.3; *Nashua Motor Express, supra,* 230 F.Supp. at 652–653. In the most detailed analysis of the problem available, the District Court determined that

> . . . the relatively numerous cases decided in this area offer ample and convincing testimony to the effect that such expressions . . . have customarily been used in the far narrower and more particular sense which the words themselves denote. These cases show that inadequacy of present service is not a term which is convertible with that of public convenience and necessity, but is, rather, only one element to be considered in arriving at the broader determination of public convenience and necessity. . . .
> Thus faced with the question of which of two possible constructions to place upon the words of the Commission, we conclude that it is more probable that the Commission intended the narrower customary interpretation we have just described.

*Nashua Motor Express, supra,* 230 F.Supp. at 652.

### D. Inherent Advantages of the Proposed Service

Nowhere does either the National Transportation Policy or the Interstate Commerce Act refer to the inherent advantages of the applicant's proposed service. Instead, the ICC is restrained by the National Transportation Policy "to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each." 49 U.S.C. preceding § 1. These "modes" of transportation refer to the various basic types or forms of transportation— by water, by motor carrier, by rail, etc.

■ Where different modes of transportation come into conflict, the primary issue before the ICC is the inherent advantages attributable to each type. In *Schaffer Transportation Co. v. United States,* 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957), the ICC denied an application to a common carrier by motor truck for authority to transport granite between various points then served exclusively by rail service. In reversing the ICC, the Supreme Court stated:

> . . . When a motor carrier seeks to offer service where only rail transportation is presently authorized, the inherent advantages of the proposed service are a critical factor which the Commission must assess. How significant these advantages are in a given factual context and what need exists for a service that can supply these advantages are considerations for the Commission.

Rather than evaluate the benefit that Schaffer's proposed motor service might bring to the public, the Commission cast its first principal conclusion in terms of the adequacy of existing rail service, finding that service to be "reasonably adequate." . . . Of course, adequacy of rail service is a relevant consideration, but . . . *"relative or comparative adequacy"* of the existing service is the significant consideration when the interests of competition are being reconciled with the policy of maintaining a sound transportation system. . . . [T]he Commission has not determined whether there are benefits that motor service would provide which are not now being provided by the rail carriers, whether certification of a motor carrier would be "unduly prejudicial" to the ex-

---

tantamount to giving the term "necessity" the meaning of "absolute or urgent necessity." But this definition has been specifically rejected as frustrating the statutory scheme envisioned by Congress. *Denver & R. G. W. R. R., supra,* 312 F.Supp. at 333, and cases cited

therein. Instead, the term has been defined as "a substantial need for present or future service which *is not or cannot* be adequately supplied by existing carriers." 312 F.Supp. at 333 (emphasis added).

isting carriers, and whether on balance the public interest would be better served by additional competitive service. To reject a motor carrier's application on the bare conclusion that existing rail service can move the available traffic, without regard to the inherent advantages of the proposed service, would give one mode of transportation unwarranted protection from competition from others. . . .
"[T]he public [should not] be deprived of a new and improved service because it may divert some traffic from other carriers."

355 U.S. at 89–91, 78 S.Ct. at 177 (emphasis added). *See also Dixie Carriers, Inc. v. United States,* 351 U.S. 56, 59–61, 76 S.Ct. 578, 100 L.Ed. 934 (1956).

There is a direct analogy between consideration of the inherent advantages of different modes of transportation and consideration of the inherent advantages of a proposed service over existing service within the same mode. Decisions of the lower federal courts have long required the Commission to consider, as a factor contributing to the public convenience and necessity, the inherent advantages of the proposed service. *E.g., Lemmon Transport, supra,* 393 F.Supp. at 841–842; *Union Mechling v. United States,* 390 F.Supp. 391, 404–405; *C–Line, supra,* 376 F.Supp. at 1052–1054; *Yellow Forwarding, supra,* 369 F.Supp. at 1045–1046; *Slay Transportation, supra,* 353 F.Supp. at 560; *Lang Transportation, supra,* 75 F.Supp. at 930–931; *A. B. & C. Motor Transportation, supra,* 69 F.Supp. at 169–170.

In the most renowned case on point, *Nashua Motor Express, Inc., v. United States,* 230 F.Supp. 646 (D.N.H.1964), the Court determined that, in addition to the element of inadequacy of service,

> . . . [o]ther elements of importance appear to be the desirability of competition, the desirability of different kinds of service, and the desirability of improved service.
>
> \* \* \* \* \* \*
>
> . . . The element of inadequacy is thus not a controlling one, but it is to be

considered along with the other factors mentioned above. Even apart from the cases cited, it appears to be the more reasonable view that the narrower conceptual element of inadequacy of present service was not intended to be imposed as a strait jacket upon the process of determining the broader interest of public convenience and necessity in the effectuation of the National Transportation Policy. We find nothing in the broader discussion of this policy which would urge a contrary view. . . . [citing *Schaffer Transportation, supra,* 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117; *Parker, Supra,* 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051].

230 F.Supp. at 652–653.

█ It is clearly within the National Transportation Policy to require the Commission to consider the inherent advantages of a proposed service when the applicant claims to hold out a service different than, or containing an improvement to, existing services. Were the Commission not to consider the inherent advantages of proposed services, the policy favoring competition would have little meaning; the transportation industry would cease to evolve and become grotesquely ill-suited for its task of bearing the nation's commerce. The Commission possesses administrative discretion only with regard to granting permission to effectuate a new service; it has no power to compel existing carriers to improve their services. Hence, to maintain the health of the industry, the Commission must take into account the inherent advantages of a proposed service when determining the public convenience and necessity. *See Parker, supra,* 326 U.S. at 72–73, 65 S.Ct. 1490.

█ The inherent advantages of a proposed service are of course, only one basic finding that might influence the ultimate findings of the Commission in the exercise of its expert discretion. The desirability of the proposed services cannot be said to outweigh other factors the Commission must consider. *C–Line, supra,* 376 F.Supp. at 1053; a mere preference for a new service

on the part of shippers is not sufficient in itself to justify a grant of authority. *Lester C. Newton Trucking, supra,* 264 F.Supp. at 885–886. As a practical matter, however, the desirability of a new or improved service would appear to be, like the question of inadequacy of existing service, an important determination affecting several different ultimate findings.

In the case now before the Court, the Commission found that the protesting carriers had "substantial ability and willingness to meet the generalized needs of shipper." The apparent meaning of this phrase is that the aggregate of the existing service has been found to be adequate to meet the basic needs of the shippers, though no carrier could offer all of the items of service proposed by Trans-American.[19] But this vague statement begs the relevant question. No one shipper can use the aggregate of the existing services to make a single shipment of goods. He must use *one* carrier. And what reasonable meaning can be given the term "generalized needs?"

In properly weighing the two pragmatically important factors of adequacy of existing service and the inherent advantages of the proposed service, the question before the Commission is logically the "relative or comparative" adequacy of service, in light of the service proposed and all other relevant factors. The Commission has avoided this question in the present case by speaking abstractly of the aggregate of services available and the generalized needs of the shippers.

A specific question has arisen with regard to the rates charged to carry the goods in question. Plaintiff has emphasized the facts that many protestants impose special rates for services, such as loading and unloading shipments and handling uncrated items, and that many protestants discourage less than truckload shipments by imposing a rate based upon a weight of 10,000 pounds or more. The ICC, in its brief, completely rejects Plaintiff's argument on the ground that rates are generally not a matter for consideration in a common-carri-

er application proceeding, if the rates are not so high as to constitute an embargo against the traffic. *See American Trucking Ass'n v. United States,* 326 U.S. 77, 86–87, 65 S.Ct. 1499, 89 L.Ed. 2065 (1945); *Auclair Transportation Inc. v. United States,* 221 F.Supp. 328, 333–334 (D.Mass. 1963), aff'd per curiam, 376 U.S. 514, 84 S.Ct. 966, 11 L.Ed.2d 968 (1964). The Supreme Court, however, has differentiated those cases where a carrier seeks to provide service to an area already served by basically the same type of transportation, only at a lower rate.

. . . Those decisions are entirely different from the situation presented here, where a motor carrier seeks to compete for traffic now handled exclusively by rail service. In these circumstances a rate benefit attributable to differences between the two modes of transportation is an "inherent advantage" of the competing type of carrier and cannot be ignored by the Commission.

*Schaffer Transportation, supra,* 355 U.S. at 92, 78 S.Ct. at 178. The analogy between "modes" of service and different kinds of the same mode of service would again appear to be direct. The Commission should not oversimplify the competing congressional aims "to promote safe, adequate, economical, and efficient service" and yet avoid "unfair or destructive competitive practices" by adopting a hard and fast rule that ignores any consideration of rate structures. If lower rates are an additional inherent advantage of a proposed different or improved service, they would appear to be a relevant factor for the Commission to consider in reaching ultimate findings concerning competition and the sound economic condition of the industry.

*E. Future Needs*

Another factor the Commission must always consider is the future needs of the public and commerce. *Union Mechling, supra,* 390 F.Supp. at 401; *Younger Bros., supra,* 289 F.Supp. at 547–548; *Lester C. Newton Trucking, supra,* 264 F.Supp. at

**19.** A similar definition was proffered at oral argument by counsel for the ICC.

885. The Interstate Commerce Act, 49 U.S.C. § 307(a), requires the Commission to grant a certificate when it "is or will be required by the present or future public convenience and necessity."

Indeed, the Commission must consider future needs and changes in commerce even when they are uncertain. *Union Mechling, supra,* 390 F.Supp. at 395–401. This issue was adequately developed by the hearing examiner in the present case, though the Review Board subsequently determined that he placed too strenuous a burden of proof on the applicant.[20]

## IV. THE DECISIONAL PROCESS

### A. The Role of the Commission as an Expert Fact-Finder

■ The expertise of the ICC in matters concerning the transportation industry sets it apart from ordinary fact-finding bodies. Congress has entrusted the Commission with the necessary discretion to promote the declared congressional policies when the broad generalizations of the National Transportation Policy produce overlapping aims. In such situations, the Commission must not only appraise the facts and draw inferences from them, but also exert its expert judgment to determine from an analysis of the infinitely variable factors contributing to the total situation, on which side of the controversy the public interest lies. *Burlington Truck Lines, supra,* 371 U.S. at 167, 83 S.Ct. 239; *Detroit & Cleveland Navigation, supra,* 326 U.S. at 241, 66 S.Ct. 75; *Parker, supra,* 326 U.S. at 66, 65 S.Ct. 1490; *Red Ball Motor Freight, supra,* 98 F.Supp. at 250–251.

As a practical matter, the Commission's expert discretion has often been described as the power to weigh the competing interests of consumer benefits in "adequate, economical, and efficient service" against any adverse impact upon the existing carriers that would thwart "sound economic conditions in transportation and among the several carriers." *Bowman Transportation, supra,* 419 U.S. at 293, 95 S.Ct. 438; *Burlington Truck Lines, supra,* 371 U.S. at 167, 83 S.Ct. 239; *Pierce Auto Freight Lines,* 327 U.S. at 535–536, 66 S.Ct. 687.

### B. Burden of Proof

Much of the argument in the present case has centered around the issues whether the ICC properly allocated the burden of proof and whether it appreciated the significance of the finding that Trans-American had established a *prima facie* case.

Section 556(d) of the APA provides: "Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof." The Committee reports explained: "that the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case, but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain."

K. Davis, *supra,* § 14.12 at 287.

■ It is universally accepted that, in a case involving an application for a common-carrier certificate, the burden of proof is on the applicant to demonstrate that its proposed service is required by the public convenience and necessity. *Lemmon Transport, supra,* 393 F.Supp. at 841–842; *Yellow Forwarding, supra,* 369 F.Supp. at 1045–1046; *Town of Montague, supra,* 306 F.Supp. at 1229; *Sloan's Moving & Storage Co. v. United States,* 208 F.Supp. 567, 571 (E.D.Mo.1962), *aff'd per curiam,* 374 U.S. 95, 83 S.Ct. 1687, 10 L.Ed.2d 1026 (1963).

Thus, the applicant has the initial burden of proving a *prima facie* case of public convenience and necessity in light of all relevant factors. *Lemmon Transport, supra,* 393 F.Supp. at 841–842.

The term *"prima facie* case," however, can have two meanings: (1) in the way of

---

**20.** An examination of the Report and Order of the Hearing Examiner in the present case reveals that he apparently conceived of the term "need" in the impermissibly strict sense. *See* text at note 5 *supra;* note 18 *supra.*

presumption, that the party having the original burden of proof has produced evidence sufficient to support a finding and adjudication for it on the issue in litigation if its opponent should fail to produce any rebutting evidence; or (2) that the proponent of an issue in litigation has produced enough evidence to pass the scrutiny of the trier of law and has presented a valid issue for the trier of fact. 9 Wigmore on Evidence § 2494 (3rd ed. 1940 & Supp.1975). Plaintiff has urged the former construction; the ICC has urged the latter.[21]

■ Although the decision of the Commission fails to clarify this issue, a review of the caselaw reveals that the former interpretation is the proper one. Where the applicant has established a *prima facie* case, the burden of going forward with the evidence shifts to the protestants to overcome the showing made by the applicant and to demonstrate that the public convenience and necessity require that the application be denied. *Bowman Transportation, supra,* 419 U.S. at 286–289, 95 S.Ct. 438; *Eastern Air Lines, supra,* 271 F.2d at 759 & n.15; *Sloan's Moving & Storage, supra,* 208 F.Supp. at 571; *Clarke v. United States,* 101 F.Supp. 587, 594 (D.D.C.1951); *Delaware Coach Co. v. Savage,* 81 F.Supp. 293, 296 (D.Del.1948); *National Motor Freight Traffic Ass'n v. Columbia Shippers,* 105 M.C.C. 846, 850 (1967); *Caudell Transfer Co. Extension—Chattanooga,* 103 M.C.C. 895, 897 (1967).

In *ICC v. J–T Transport Co.,* 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1968), the Supreme Court laid out the burden of proof in contract carriage cases under 49 U.S.C. § 309(b).

. . . The Commission seems to have placed the burden of proving inadequacy of existing services on the applicant, for it said that the applicant had not shown that the service of U.S.A.C. was "inadequate." . . . Such a burden is improperly placed on the applicant, as the rejection of the proposed amendment to § 209(b) [49 U.S.C. § 309(b)] suggests. The capabilities of protesting carriers are matters peculiarly within their knowledge. . . .

The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants.

368 U.S. at 90, 82 S.Ct. at 210. The ultimate burden of proof is less onerous under 49 U.S.C. § 309(b) than under 49 U.S.C. § 307(a), but this Court sees no reason why the mechanics of proof should differ once the applicant has established a *prima facie* case.

There are sound policy reasons supporting this conclusion. In the case of an expert fact-finder with as much discretion as the Commission, it is extremely difficult to separate the roles of finder of fact and judge of law. The expert discretion of the ICC gives it the ability to take up any slack in the burden of proof at the initial stage of the presentation of applicant's case. *Town of Montague, supra,* 306 F.Supp. at 1229. Hence, the broader definition of "*prima facie* case" would have little meaning.

■ Moreover, the ICC's position is inherently biased in favor of the protestants by requiring the applicant to bear extensive proof of the negative.[22] The Commission

---

**21.** The ICC has urged that a *prima facie* case means nothing more than a finding that shippers have goods moving in commerce for which they need transportation. Even a summary review of the three cases cited in the Report of the Commission refutes this contention. *See Richard Dahn, supra,* 335 F.Supp.

337; *Clay Hyder Trucking Lines, supra,* 115 M.C.C. 600; *Novak, supra,* 103 M.C.C. 555.

**22.** . . . [B]y assigning to the applicants the burden of proving the inadequacy of existing services, the Commission favored the protestants' interests at the expense of the

proposes to place the entire burden of proof of nationwide inadequacy of service on Plaintiff.[23] It is a general doctrine of evidence that where the facts with regard to an issue lie peculiarly in the knowledge of one party and where it would be particularly onerous to force the other party to bear the proof of the negative, the burden of proving the issue lies with the knowledgeable party. *See* 9 Wigmore on Evidence, *supra,* § 2486; McCormick on Evidence, § 337 (2nd ed. 1972). Based on these considerations, the Court in *Clarke v. United States,* 101 F.Supp. 587, 594 (D.D.C.1951), concluded that the burden of proving any alleged adverse effect on the transportation industry resulting from the issuance of a common-carrier certificate should be placed on the protestants. The reasoning in *Clarke* has been adopted by the Second Circuit in the review of other administrative agencies, *Eastern Air Lines, supra,* 271 F.2d at 759 & n.15, and this Court sees no reason to adopt any other rule.

In the present case, the ICC has urged on brief and at argument that while the burden of going forward with the evidence shifts to the protestants, they need not actually carry any burden of proof.[24] In light of the foregoing analysis, this position is clearly untenable. The protestants must bear the burden of proving everything peculiarly within their knowledge—to the effect that public convenience and necessity require that the certificate not be issued. Of course, the question whether protestants have met their burden of proof is one for the Commission as fact-finder. And, if the

Commission determines that they have, the burden of going forward with the evidence shifts back to the applicant.[25]

There remains one final semantic problem concerning the burden of proof. In its decision, Review Board No. 3 concluded that Trans-American had established a *prima facie* case of "public need." It is impossible to tell from the report of the Review Board whether the term "public need" is synonymous and coextensive with "public convenience and necessity" or whether it represents an intermediate finding based on a consideration of some limited number of factors. If the Commission intended the latter definition (and, indeed, why should it use a term different than "public convenience and necessity" unless it intended the term to have a different meaning?), there is no indication of what factors it took into account to reach this intermediate finding.[26] Thus, this Court is again unable to discern what factors the Commission weighed in reaching its ultimate decision.

## V. CONCLUSION

It is evident from the Report of Review Board No. 3 in this case that the Commission considered proof of inadequacy of existing service to be a condition precedent to a showing of public convenience and necessity. The Commission failed to analyze what other factors might be relevant to Plaintiff's application and failed to set forth any consideration of factors other than inadequacy and the nationwide scope of Trans-American's application as reasons for denial.[27] The Court can find nothing in

---

shippers' in a manner not countenanced by anything discoverable in Congress' delegation to it of responsibility.

*J–T Transport, supra,* 368 U.S. at 90, 82 S.Ct. at 210.

23. *See* note 21 *supra.*

24. This argument is based on the ICC's conception of the meaning of a *prima facie* case. *See* note 21 *supra.*

25. Evidence adduced on cross-examination of the protestants' witnesses can certainly be used as relevant evidence by the applicant in strengthening his direct case that public convenience and necessity require issuance of the certificate. *See* 3A & 5 *Wigmore on Evidence,*

*supra,* §§ 878 & 1368; *McCormick on Evidence, supra,* §§ 21 & 29.

26. At oral argument, counsel for the ICC stated that the "showing of need could have covered any of a number of areas."

27. Because this Court reverses on other grounds, we decline to rule on the question raised by Plaintiff whether the ICC is required by statute to carve out a lesser grant of authority than that sought if the Commission determines that such lesser authority is required by the public convenience and necessity. Plaintiff relies solely on the following mandatory language of 49 U.S.C. § 307(a):

the Report of the Commission to indicate that the Commission considered other indicative factors—particularly Plaintiff's claim of a different and improved service offering significant advantages to shippers—and must conclude that it did not. The terms "inadequate service," "*prima facie* case," and "public need" are inadequately defined to enable this Court to clearly ascertain the basis for the Commission's ultimate finding. If the Court should assume the most likely definitions for these terms, then the Commission has failed to apply the proper burden of proof and to accord the proper significance to its finding that Plaintiff had established a *prima facie* case.

■ In sum, we find that the Report of the Commission evidences arbitrary and capricious action by requiring proof of inadequacy of existing services as a necessary element, by failing to identify any basis for its ultimate finding other than inadequacy of service, and by failing to apply the proper burden of proof.[28] Further, the Report of the Commission in this action is inherently unclear and selfcontradictory.[29]

Because we reverse on the issue of arbitrary and capricious action, there is no reason for the Court to rule on the substantiality of the evidence underlying the Commission's decision. This Court does not pretend to assume the expert discretion that Congress has delegated to the Commission, and on remand the Commission is free to exercise that discretion within the guidelines set forth in this opinion and to reach any result it reasonably deems required by public convenience and necessity.

Although we have expressed disagreement and puzzlement with several areas of the Commission's decision, we do not intend to intimate by this opinion that the Commission in any manner foresook its role as an impartial adjudicator for that of an advocate marshaling findings to support a predetermined preference. *Cf. Arkansas-Best Freight System, Inc. v. United States*, 364 F.Supp. 1239, 1264 (W.D.Ark.1973), *rev'd sub nom. Bowman Transportation, supra,* 419 U.S. at 297, 95 S.Ct. 438. Instead, the less ugly possibility herein is that the overburdened and understaffed Commission, when presented with this complex

A certificate *shall be issued* to any qualified applicant therefor, authorizing the whole *or any part* of the operations covered by the application, if it is found that . . . the proposed service, *to the extent to be authorized* by the certificate, is or will be required by the present or future public convenience and necessity . . . .

(emphasis added).

The ICC, in opposition, cites numerous ICC decisions to the effect that it has the discretion, but no obligation, to carve out lesser grants of authority. The Commission, however, fails to offer any reason why it should not have to exercise this discretion to carve out within the same procedural framework that applies to the remainder of its expert discretion.

The Court is of the opinion that the resolution of this matter is best left until such time as the issue has been squarely raised, argued, and decided on the record below. *See also* note 4 *supra.* For the benefit of the parties, however, should the issue arise again on remand, the Court notes that the discussions in the text *supra* of the role of the Commission as an expert fact-finder in weighing relevant factors, of particular relevant findings, and of requiring proof of the negative, as well as the following cases, may prove to be relevant: *Bowman Transportation, supra,* 419 U.S. at 299–300, 95 S.Ct. 438, on remand (question of grant of

authority greater than that in application remanded to the district court for determination); *Parker, supra* 326 U.S. at 71–72, 65 S.Ct. 1490 (noting that if a grant of authority should prove in the future to be too broad, so that the balance of public convenience and necessity shifts, the Commission can correct the situation at that time).

**28.** Additionally, the Court has not determined whether the inclusion of the summary of "evidence" of five "witnesses" who never actually testified before the Commission constitutes arbitrary and capricious action. The Court does not feel that a determination is necessary at this time. While the Commission, as an expert fact-finder, does have some leeway with respect to evidentiary matters, the Court notes that there would be little sense in having formal hearings were the Commission allowed to go outside those hearings whenever it pleased to obtain unverified evidence. Even expert discretion has its limitations.

**29.** As an additional example of the inherent contradictions in the Report, compare the discussions of Plaintiff's production of evidence of traffic volume and points in the Report of the Commission at 3 & 4 (herein text at notes 6 & 7 *supra* ).

and voluminous factual record, failed to accord the present case the inordinate amount of time and effort it demanded. By so doing, the Commission has unfortunately produced a decision that is at best unclear as to its purported findings, or, at worst arbitrary, capricious, and without basis in the law. *See Nashua Motor Express, supra,* 230 F.Supp. at 652. The ICC cannot escape "the complexity of the task the Commission faces in evaluating and balancing the numerous considerations that collectively determine where the public interest lies in a particular situation." *Schaffer Transportation, supra,* 355 U.S. at 92, 78 S.Ct. at 178.

Review of administrative decisions is an area of the law particularly given to broad, general observations by the judiciary. These overlapping generalizations complicate the already overlapping aims of Congress that the agencies must attempt balance. Most of the cases relied on by the ICC in its brief before this Court do indeed stand for the broad, general propositions for which they are cited. But they simply do not apply to the present case. We have attempted by this lengthy decision to reconcile some of those generalizations to the present factual setting and provide a more definite framework within which the Commission can freely exercise its expert discretion.

Judgment will be entered remanding this cause of action to the ICC for clarification or further proceedings in accordance with this Opinion.